# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

| | |
|---|---|
| MATTHEW MONTEZ,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br><br>Defendant. | Court No. 2:19-cv-00195-DBP<br><br><br>MEMORANDUM DECISION<br>& ORDER<br><br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Matthew Montez (Plaintiff), pursuant to 42 U.S.C. § 405(g), seeks judicial review of the decision of the Commissioner of Social Security (Commissioner) denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). After careful review of the entire record, the parties' briefs, and arguments presented at a telephonic hearing held on January 30, 2020 (ECF No. 30), which was continued to and completed on February 18, 2020 (ECF No. 29, ECF No. 31), the undersigned rules as set forth herein and AFFIRMS the Commissioner's final decision.[1]

---

[1] The parties in this case consented to United States Magistrate Judge Dustin B. Pead conducting all proceedings, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit. (ECF No. 16.) *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. PROCEDURAL HISTORY

In a March 28, 2017, application for DIB under Title II of the Act, Plaintiff alleged disability based on several conditions, including autoimmune illness, diabetes, a back injury, and depression/anxiety (*see* ECF No. 11, Transcript of Administrative Record (Tr.) 213-21, 298).

Following a hearing (Tr. 33-99), an administrative law judge (ALJ) issued an October 2018 decision denying Plaintiff's application (Tr. 17-27). The Appeals Council denied Plaintiff's subsequent request for review, thereby rendering the ALJ's October 2018 decision the Commissioner's final administrative decision for purposes of judicial review (Tr. 1-8). *See* 20 C.F.R. § 404.981.[2] This appeal followed and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II. SUMMARY OF THE EVIDENCE

Plaintiff alleged disability beginning in March 2017, at which time he was 48 years old (Tr. 215). He previously worked as an online order clerk, materials handler, supply clerk, and supply controller, all of which are semiskilled occupations and most of which are heavy exertion (Tr. 26, 90-91, 310-19).

Plaintiff received the bulk of his treatment at the Department of Veteran Affairs (the VA). Treatment notes reflect that Plaintiff had a bout of shingles on his buttocks in January 2017 (Tr. 1057). He alleged residual low back pain after that (Tr. 918). A March 2017

---

[2] All citations to the Code of Federal Regulations (C.F.R.) are to the 2018 edition unless otherwise noted.

MRI showed mild degenerative changes in the mid to lower lumbar spine (Tr. 455-57). He later completed a course of physical therapy and reported he was able to effectively manage his symptoms by December 2017 (Tr. 2128-30).

Plaintiff saw a rheumatologist for routine follow up every three months for Sjogren's syndrome and polymyositis (Tr. 46, 1029-32, 918-21, 1296-1301, 1899-1905, 2088-94). Treatment notes reflect that these conditions were well managed with medications (Tr. 921, 1032, 1300, 1904-05, 2093). While Plaintiff continued to subjectively complain of a dry mouth, his rheumatologist documented normal objective findings—i.e., moist mucous membranes (*see* Tr. 921, 1301, 1904-05, 2092-93). In March and June 2017, Plaintiff reported that his muscle pain/weakness was stable and not worse—but at these visits, his main complaints were anus and low back symptoms that he experienced after having shingles in January 2017 (Tr. 918, 1029). By October 2017, and again in January and April 2018, Plaintiff denied any weakness and joint pain in his everyday life (Tr. 1296, 1900, 2088). Physical examinations show Plaintiff could easily go from sitting to standing without using his hands and that he had full (5/5) muscle strength, no joint tenderness, and normal range of motion (Tr. 921, 1032, 1300, 1904, 2092; *but see* Tr. 1300 (motion at extreme of rotation of back limited by discomfort in October 2017)).

The record also reflects a history of depression and anxiety (*see* Tr. 481). In April 2017, Plaintiff began seeing nurse practitioner Jamie Levasseur (Ms. Levasseur), APRN-Resident, for mental health care, including medication management (*see* Tr. 481-90). He saw Ms. Levasseur for a regular follow up about once every one or two months (Tr. 912-18, 964-70, 1308-13, 1329-41, 1707-13, 1876-83, 1979-85, 2031-38, 2111-19). In January 2018, Plaintiff started seeing

3

Julie McCauley (Ms. McCauley), LCSW, for individual counseling (Tr. 2084-85). Plaintiff saw Ms. McCauley on a weekly or biweekly basis (*see* Tr. 1686, 1699, 1713, 1724, 1740, 1872, 1896, 1916, 1925, 1975, 1989, 2004, 2018, 2061, 2073, 2456, 2462). Additionally, the record reflects that Plaintiff saw consultative psychiatrist Sayali Kulkarni, M.D. (Dr. Kulkarni), in May 2017 for evaluation in connection with his claim for VA benefits (Tr. 1584-91).

Starting in May 2017, Plaintiff started regularly attending yoga and Qi Gong classes at the VA. These classes were offered as part of the Integrative Medicine health care programs where individuals could attend and participate as they wished (*see* Tr. 82). During the relevant time period, Plaintiff attended more than 100 yoga classes and more than 30 Qi Gong classes, as well as at least 15 MOVE Group classes (a weight management and health promotion program) (*see* Tr. 911-72, 1291-1370, 1687-1747, 1873-2194, 2457-61).

Plaintiff and his attorney appeared at an August 2018 administrative hearing where an ALJ heard testimony from Plaintiff, medical expert Michael Enright, Ph.D. (Dr. Enright), and a vocational expert (Tr. 33-99; *see also* Tr. 1610-26).

## III. STANDARD OF REVIEW

As the Supreme Court recently reiterated, "[o]n judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153, 203 L. Ed. 2d 504 (2019) (quoting 42 U.S.C. § 405(g)). Under the substantial evidence standard, the threshold for evidentiary sufficiency is "not high." *Id.* at 1154. Substantial evidence is "more than a mere scintilla"; it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotations and citations

4

omitted). Under this deferential standard, the Court may neither reweigh the evidence nor substitute its judgment for that of the ALJ. *See Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014). The court's inquiry "as is usually true in determining the substantiality of evidence, is case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Biestek*, 139 S. Ct. at 1157.

## IV. DISCUSSION

In October 2018, the ALJ issued a decision, following the regulatory five-step sequential evaluation, and determined that Plaintiff was not disabled (*see* Tr. 17-27). *See* 20 C.F.R. § 404.1520(a)(4).[3] As relevant here, the ALJ found that Plaintiff had several severe impairments, but the record as a whole shows that he retained the residual functional capacity (RFC)[4] for a limited range of light work as defined at 20 C.F.R. § 404.1567(b) (Tr. 19-26). Specifically, the ALJ found Plaintiff could:

- lift 20 pounds occasionally and 10 pounds frequently;
- stand or walk about six hours total in an eight-hour workday with customary breaks;
- never climb ladders, ropes, or scaffolds;
- occasionally climb ramps and stairs;
- occasionally balance, kneel, stoop, crouch, and crawl;

---

[3] The adjudicator considers whether the claimant: (1) is working at the substantially gainful activity level; (2) has a severe impairment(s); (3) has a condition that satisfies the criteria of a per se disabling impairment (at Appendix 1); (4) retains the ability to perform past relevant work; and, if not, (5) can perform other work. *See* 20 C.F.R. § 404.1520(a)(4).

[4] RFC represents the most a claimant can still do notwithstanding his functional limitations. *See* 20 C.F.R. § 404.1545.

5

- frequently push and pull with the upper extremities;

- not tolerate exposure to extreme cold or heat, or hazards, such as heights, machinery, and so forth;

- occasionally (50-75% of the time) make judgments on complex work decisions;

- frequently but not constantly (80-90% of the time) carry out simple instructions;

- make judgments on simple work-related decisions;

- understand, remember, and carry out complex instructions;

- interact appropriately with the general public, supervisors, and coworkers; and

- respond appropriately to usual work situations and changes in a routine work setting

(Tr. 21). The ALJ then relied on vocational expert testimony to find that Plaintiff could perform work existing in significant numbers in the national economy, including the light, unskilled representative occupations of production assembler, office helper, and routing clerk (Tr. 26-27). Accordingly, the ALJ found Plaintiff was not disabled within the meaning of the Act (Tr. 27).

In challenging the ALJ's decision, Plaintiff asserts that the ALJ erred in considering his Sjogren's syndrome and polymyositis, accounting for his absenteeism due to the attendance of medical appointments, and evaluating the opinion evidence (*see generally* ECF No. 21, Plaintiff's Opening Brief (Pl. Br.); ECF No. 28, Plaintiff's Reply Brief (Pl. Reply)). For the reasons discussed below, the Court finds that the ALJ's decision should nonetheless be AFFIRMED.

### A. The ALJ adequately accounted for Plaintiff's Sjogren's syndrome and polymyositis in the RFC assessment

Plaintiff argues the ALJ did not account for his Sjogren's syndrome and polymyositis in assessing his RFC (*see* Pl. Br. 7-14).[5] Yet, the Court finds that the RFC assessment adequately accounts for the functional limitations stemming from these conditions.

In arguing he had greater limitations than those assessed by the ALJ, Plaintiff relies heavily on several statements from Ms. Levasseur (*see* Pl. Br. 8-10, citing Tr. 353, 1628-29). In letters dated August 2017 and March 2018, Ms. Levasseur describes what types of symptoms may be associated with Sjogren's syndrome and polymyositis and opines that Plaintiff "is not employable at this time" (Tr. 353, 1628-29). Ms. Levasseur also completed a checkbox form in July 2018, indicating, among other things, that Plaintiff had marked to extreme limitations in interacting with others (Tr. 2408-10). The ALJ specifically considered Ms. Levasseur's statements, but found they were not supported by and not consistent with the other evidence of record (*see* Tr. 25). *See* 20 C.F.R. 404.1250c(b)(2).[6] In doing so, the ALJ further explained that Ms. Levasseur did not describe Plaintiff's functioning, other than making the conclusory statement that Plaintiff was "not employable at th[e] time" (Tr. 25).[7] Based upon the

---

[5] Pinpoint citations rely on Plaintiff's designated pagination at the bottom-right corner of his opening brief.

[6] Because Plaintiff filed his application in this case on or after March 27, 2017, the agency's revised regulations apply. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844 (Jan. 18, 2017).

[7] The revised regulations explain that statements on issues reserved to the Commissioner— such as statements that a claimant is unable to work—are inherently neither valuable nor persuasive, and the agency will not provide any analysis of how such evidence was considered. *See* 20 C.F.R.

(continued . . .)

7

longitudinal record, the Court finds that substantial evidence supports the ALJ's finding that Ms. Levasseur's statements were not persuasive and of little assistance in accurately determining Plaintiff's functioning (*see* Tr. 25). The ALJ reasonably highlighted treatment notes reflecting Plaintiff's mental health symptoms as manageable with treatment, and there was no evidence to support marked or extreme limitations (*see* Tr. 25).

Next, Plaintiff contends the ALJ erred in finding that he could stand and/or walk about six hours in an eight-hour workday (*see* Pl. Br. 12). The Court, however, finds no error. The vocational expert explicitly testified that a hypothetical individual with Plaintiff's RFC could perform "unskilled light and sedentary work," including the representative occupations of table sorter and touch-up screener (Tr. 93-94). Sedentary work is performed primarily seated, with only about two hours of walking/standing in an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3. In other words, the record establishes that Plaintiff could perform other work in the national economy even if he had been limited to only two hours of standing and walking in an eight-hour day. *Cf. Bainbridge v. Colvin*, 618 F. App'x 384, 391 (10th Cir. 2015) (unpublished) ("We need not resolve whether the ALJ should have included the additional manipulative limitations because, even if she should have, the error was harmless. . . . The [vocational expert] testified that the additional manipulative limitations would not preclude work as a surveillance system monitor . . . ."). But more to the point, it is Plaintiff's burden to show what his functional limitations are and, even now, he does not point to evidence that shows he could not stand for six hours a day—let alone that he could not stand for at least two hours a day.

§ 404.1520b(c)(3)(i).

*See* 20 C.F.R. § 404.1512(a) (claimant must submit evidence demonstrating how an impairment affects his functioning).

Plaintiff also generally alleges that the ALJ should have found additional limitations based on symptoms stemming from Sjogren's syndrome and polymyositis, as well as side effects from medications used to treat these conditions. Yet, the record shows these conditions were under control with treatment and it is not clear that Plaintiff had any side effects. As the ALJ accurately noted (Tr. 22-23), treatment notes consistently reflect that Plaintiff's Sjogren's and polymyositis were well managed with medications (Tr. 921, 1032, 1300, 1904-05, 2093). While Plaintiff continued to subjectively complain of a dry mouth, his rheumatologist documented normal objective findings—i.e., moist mucous membranes (*see* Tr. 921, 1301, 1904-05, 2092-93). In March and June 2017, Plaintiff reported his muscle pain/weakness was stable and not worse—and at these visits, his main complaints were anus and low back symptoms that he experienced after having shingles in January 2017 (Tr. 918, 1029). By October 2017, and again in January and April 2018, Plaintiff denied weakness and joint pain in his everyday life (Tr. 1296, 1900, 2088). Physical examinations show Plaintiff could easily go from sitting to standing without using his hands and that he had full (5/5) muscle strength, no joint tenderness, and normal range of motion (Tr. 921, 1032, 1300, 1904, 2092; *but see* Tr. 1300 (motion at extreme of rotation of back limited by discomfort in October 2017)).

While Plaintiff asserts that the record showed "day-to-day weakness" (Pl. Br. 12, citing Tr. 2677, 2681), the April 2018 treatment note he relies upon actually reflects the opposite (*see* Tr. 2676-82, *duplicate at* Tr. 1899-1905). Specifically, Plaintiff told his rheumatologist that he

9

had somewhat decreased his exercise due to a cold, "does not experience weakness in his day to day life" and denied joint pain or weakness (Tr. 2677, 2679). Moreover, his rheumatologist indicated that "[h]e is able to get out of his chair and off the ground without any help" (Tr. 2677). On examination, Plaintiff had no tenderness in his hands or wrists and exhibited normal strength and range of motion throughout (Tr. 2681). Noting that "he is having no muscle pain or weakness" and "[h]is strength is stable," Plaintiff's rheumatologist once again concluded that Plaintiff's polymyositis was stable (Tr. 2681).

Plaintiff also asserts the record contains "numerous references to fatigue and malaise associated with the polymyositis" (Pl. Br. 10-11), but the handful of records Plaintiff cites do not support this claim. First, Plaintiff points to an April 2017 mental health intake (Tr. 488), and an August 2017 mental health treatment note, which state that, "[d]espite improvements in his mood [by August], he report[ed] feeling easily emotionally overwhelmed and fatigued by completing multiple tasks during the daytime" (Tr. 1335-36). Plaintiff reports that he managed this by pacing himself and taking breaks (Tr. 1335-36). Yet, mental fatigue from emotional stressors is not fairly characterized as "fatigue . . . associated with the polymyositis" (*see* Pl. Br. 11).

Second, Plaintiff cites to a May 2017 treatment visit for low back pain stemming from shingles, where he reported a past history of chronic fatigue (Tr. 1219), as well as an April 2018 treatment visit for cellulitis (Tr. 1869-70). At the April 2018 visit he did not report months of fatigue and malaise "with associated left area pain" (*see* Pl. Br. 10). Rather, he had a two-day history of worsening left arm pain (Tr. 1870). In describing his history, Plaintiff reported he had

recently had general fatigue and malaise, but those were now stable (Tr. 1870).[8] Thus, the records Plaintiff provides as support for a past history of fatigue do not show "fatigue . . . associated with the polymyositis" (*see* Pl. Br. 11).

Finally, Plaintiff relies on notes from Qi Gong classes showing he was fatigued by the class routines (*see* Tr. 2070, 2517, 2793). But, reliance on notations of fatigue at several Qi Gong classes does not establish "fatigue . . . associated with the polymyositis" (*see* Pl. Br. 11) and is not significantly probative in light of the longitudinal evidence. Further, although Plaintiff took breaks, he fully participated and completed all the exercises (*see* Tr. 2070, 2517, 2793), and, at a class two days following an instance of fatigue, Plaintiff was noted as fully engaged and capable of completing all the Qi Gong routines without problem (Tr. 1737). Indeed, the same was true for his Qi Gong classes during the rest of the month—i.e., on May 8, May 10, May 15, May 17, May 22, May 24, and May 29 (Tr. 1689, 1693, 1698, 1706, 1718, 1722, 1724). If anything, Plaintiff's Qi Gong practice shows that he was physically capable of learning and performing a variety of exercises—and mentally capable of focusing, sustaining, and persisting in learning new skills in a social setting. During the relevant time period—which was a relatively brief period spanning just over a year and a half—Plaintiff attended more than 100 yoga classes and more than 30 Qi Gong classes, as well as at least 15 MOVE Group classes (*see* Tr. 911-72, 1291-1370, 1687-1747, 1873-2194, 2457-61).

---

[8] Indeed, this report of fatigue and malaise reflects the ongoing cold/upper respiratory infection symptoms he had during February through April 2018 (*see* Tr. 1899-90, 2038-43).

11

As a result, substantial evidence supports the ALJ's conclusion that Plaintiff's allegations were out of proportion and not fully supported by the record.

### B. Plaintiff has not shown that attending VA appointments and classes would preclude the ability to work

Plaintiff argues the ALJ erred in not accounting for his absenteeism (Pl. Br. 14-18). Specifically, he alleges that the evidence shows he would be absent from work much more than two days per month based on his medical appointments, counseling sessions, and Qi Gong and yoga classes at the VA (Pl. Br. 15-18). The Court, however, finds no error.

The question before the ALJ is whether, based on his RFC, a claimant is able to perform any work. "[W]hether the number of medical appointments affects [a claimant's] ability to work is not an appropriate consideration for assessing [his RFC] because that determination considers only the functional limitations and restrictions resulting from medically determinable impairments." *Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902, 904 (11th Cir. 2017) (unpublished) (citing SSR 96-8p).

Here, Plaintiff does not show that his attendance at medically necessary appointments or classes would preclude his ability to work. Rather, while Plaintiff asserts his Qi Gong and yoga classes were "medically directed programs" (Pl. Br. 18), these were optional Integrative Medicine health care programs available at the VA where individuals could attend and participate as they wished (*see* Tr. 82). Plaintiff's social worker recommended these holistic therapies, Plaintiff expressed interest, and his nurse practitioner referred him (Tr. 440, 489, 1590). In addition, Plaintiff does not demonstrate that he would be required to attend

appointments and classes during work hours such that they would interfere with his ability to work.

The Tenth Circuit's decision in *Razo v. Colvin*, 663 F. App'x 710 (10th Cir. 2016) (unpublished), is instructive. In *Razo*, the claimant argued that the ALJ failed to consider his need to take time off work for medical appointments, which he asserted were frequent enough to preclude gainful employment. The Tenth Circuit explained:

> To be able to perform work on a "regular and continuing basis," *see* 20 C.F.R. § 404.1545(b) & (c), one need not keep a particular work schedule. Rather, work "on a regular and continuing basis . . . means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96–8p, 1996 WL 374184, at *1, 2 (July 2, 1996).

*Razo*, 663 F. App'x at 717. Here, it appears that Plaintiff's reason for going to the VA was most frequently for yoga classes. The record reflects that he went to more than 100 yoga classes, which Plaintiff said he attended approximately three times per week (*see* Tr. 84). The record consistently indicates that yoga classes were held at 5:00 pm, i.e., after many typical work shifts have ended (*see, e.g.*, Tr. 911, 922, 930, 933, 963, 970-72, 2012, 2027). In sum, "nothing in the record indicates that [Plaintiff] was required, or would be required, to schedule [his] medical appointments during working hours so that they would interfere with [his] ability to obtain work." *See Cherkaoui*, 678 F. App'x at 904.

Additionally, the Court finds that the amount of time it takes Plaintiff to commute to the VA for his medical appointments and Qi Gong or yoga classes is not a relevant consideration. *Cf. Lopez Diaz v. Sec'y of Health Educ. & Welfare*, 585 F.2d 1137, 1140 (1st Cir. 1978) (explaining that "Congress, tightening the definition of disability [in 1967], eliminated

13

consideration of travel difficulties when those difficulties were extrinsic to the claimed disability; the length and expense of commuting and the resulting inconveniences were no longer to influence a disability determination"). "Disability insurance is not available to fund [a claimant's] decision to live far from available jobs." *Id.* Similarly, disability insurance is not available to fund Plaintiff's decision to live far away from his medical providers and Qi Gong and yoga classes.

      **C.**    **The ALJ reasonably found Dr. Kulkarni's opinion not persuasive in light of its lack of support and inconsistency with the longitudinal evidence of record**

Plaintiff argues the ALJ erred in considering the opinion of consultative examiner Dr. Kulkami (*see* Pl. Br. 18-24). Specifically, he contends "[t]he ALJ failed to comply with the relevant law regarding the weight to be afforded to an examining source," and the ALJ's findings were not adequately explained and based on a lay interpretation of medical evidence (Pl. Br. 18-24). First, the "relevant law" that Plaintiff relies on has been superseded and abrogated. Instead, the agency's recently revised regulations are applicable here.[9] Second, the ALJ reasonably evaluated the opinion evidence and adequately articulated findings. Accordingly, the Court finds no error.

---

[9] The agency's revised regulations are entitled to deference notwithstanding that they significantly change prior agency policy. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (an agency's reversal of policy is entitled to deference where Congress left the implementation of a statute to the agency). Further, judicial precedent addressing the evaluation of medical evidence is abrogated to the extent that precedent is inconsistent with the revisions. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) ("New regulations at variance with prior judicial precedents are upheld unless they exceed[] the [Commissioner's] authority [or] are arbitrary and capricious." (internal quotation marks and citation omitted)).

Because Plaintiff applied for benefits on or after March 27, 2017, the ALJ applied a new set of regulations for evaluating medical evidence that differs substantially from prior regulations. *See* 82 Fed. Reg. 5,844 (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)); 20 C.F.R. § 404.1520c (2017) (explaining how an adjudicator considers medical opinions for claims filed on or after March 27, 2017).[10] Of relevance here, the revised regulations significantly alter agency policies on the consideration of opinion evidence. *See* 20 C.F.R. § 404.1520c (2017). Specifically, the regulations no longer use the term "treating source"; instead, they use the phrase "your medical source(s)" to refer to whichever medical sources a claimant chooses to use. *See* 20 C.F.R. § 404.1520 (2017).

At issue here are the opinions of Drs. Kulkarni and Enright. In connection with a May 2017 VA benefits evaluation, consultative examiner Dr. Kulkarni opined that Plaintiff was unable to function even in a loosely supervised work setting with little social interaction (Tr. 1586). However, at the August 2018 administrative hearing, reviewing medical expert Dr. Enright opined that Plaintiff had moderate limitation in his ability to make judgments on complex work-related decisions but no more that mild limitations in any of his other work-related mental abilities (Tr. 49, 88-89). Dr. Enright explained that "[a]ll of [Plaintiff's] conditions are described as stable in the records and certainly in the most recent records" (Tr. 49) and highlighted treatment notes showing that, by August 2017, Plaintiff reported to Ms. Levasseur that his mood had improved and no longer bothered him (Tr. 56, citing Tr. 1335).

---

[10] *See also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed. Reg. 62,560, 62,578 (proposed Sept. 9, 2016) (explaining the proposed implementation process).

The ALJ found Dr. Enright's opinion highly persuasive as it was supported by and consistent with the record (Tr. 24). *See* 20 C.F.R. §§ 404.1520c(c)(1), (c)(2). Further, the ALJ noted that Dr. Enright heard Plaintiff's testimony, reviewed the entire record, and explained the basis of his conclusions at the administrative hearing (Tr. 24). On the other hand, the ALJ found that Dr. Kulkarni's opinion was less persuasive as it was not fully consistent with or supported by the objective evidence of record (Tr. 24-25). *See* 20 C.F.R. §§ 404.1520c(c)(1), (c)(2).

Plaintiff contends the ALJ improperly substituted his own medical judgment for the doctor's in finding that Dr. Kulkarni's opinion was inconsistent with his own examination findings (*see* Pl. Br. 22-23). However, as the Tenth Circuit explains, the ALJ has "a *duty* to evaluate the opinions given by the medical expert." *See Trujillo v. Colvin*, 626 F. App'x 749, 753 (10th Cir. 2015) (unpublished) (emphasis in original); *see id.* (rejecting the claimant's argument that the ALJ "gave greater weight to his own lay opinion than to the medical expert's opinion" when the ALJ discounted the doctor's opinion based on the psychological evidence in the record). Here, Dr. Kulkarni opined that Plaintiff was "unable to function adequately even in a loosely supervised work setting requiring little or no social interaction" (Tr. 1586). The ALJ, however, reasonably contrasted this opinion with Dr. Kulkarni's examination findings showing that Plaintiff had no impairment in thought process, no suicidal ideation, no evidence of hallucinations or delusions, and intact insight or judgment (*see* Tr. 25). *See White v. Berryhill*, 704 F. App'x 774, 777 (10th Cir. 2017) (unpublished) (affirming the ALJ's decision to discount a consultative examiner's opinion: "The ALJ also contrasted Dr. Kent's statement that Ms. White 'was not able to concentrate and persist on even simple tasks' with Dr. Kent's earlier

16

statement that Ms. White 'showed no significant attention or concentration difficulties on mental status evaluation.'").

Plaintiff also argues that the ALJ erred in noting that Dr. Kulkami's review of mental functioning appeared to be based almost entirely on Plaintiff's subjective complaints (*see* Pl. Br. 20). Nonetheless, the ALJ had a reasonable basis for this finding: Dr. Kulkarni's report sets forth Plaintiff's own reported symptoms at length and in detail (*see, e.g.*, Tr. 1588-90). Moreover, in considering opinion evidence, it is "entirely appropriate for the ALJ to consider where [the opining sources] got their information." *See Rivera v. Colvin*, 629 F. App'x 842, 845 (10th Cir. 2015) (unpublished).

Plaintiff further argues the ALJ should have considered whether Dr. Kulkarni's opinion was entitled to "more weight" than Dr. Enright's opinion based on the fact that Dr. Kulkarni examined him (*see* Pl. Br. 23).[11] Again, the agency's revised regulations apply to this case and the law Plaintiff relies on is superseded and abrogated. To that end, the agency no longer looks first to the ties between the claimant and the opining source, and the agency does not "weigh" any opinion evidence. Under the new regulations, the adjudicator focuses "more on the content of medical source opinions and less on weighing treating relationships against each other." 82 Fed. Reg. at 5,854. Moreover, while the relationship of the opining source is still a factor for consideration, the ALJ is not required to explain her consideration of this factor. *See* 20 C.F.R. § 404.1520c(b)(2).

---

[11] And to the extent that the ALJ noted that Dr. Kulkarni was a one-time examiner, this further showed that Dr. Kulkarni was necessarily relying largely on Plaintiff's own subjective complaints (*see* Tr. 24-25).

17

Finally, Plaintiff contends that the ALJ did not provide any specific points of inconsistency between the record and Dr. Kulkarni's opinion (Pl. Br. 20-21). The Court finds this argument unsupported in that it reads the ALJ's reasoning too narrowly. The ALJ's decision is read as a whole. Here, the ALJ set forth a summary of the inconsistent evidence and was not required to recite it again in finding that Dr. Kulkami's was not persuasive. *See Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012) (unpublished) ("The ALJ set forth a summary of the relevant objective medical evidence earlier in his decision and he is not required to continue to recite the same evidence again in rejecting Dr. Wright's opinion."). Specifically, the ALJ explained that the medical records show that Plaintiff's mental health symptoms were manageable with treatment, and that the mental status examinations were normal (*see* Tr. 22-25). *See* 20 C.F.R. §§ 404.1520c(c)(1), (c)(2).

Perhaps most significantly, Plaintiff demonstrates a wide range of daily activities that were inconsistent with Dr. Kulkarni's opinion that he was "unable to function adequately even in a loosely supervised work setting requiring little or no social interaction." Again, during a relatively brief one-and-a-half year relevant time period, Plaintiff attended more than 100 yoga classes and more than 30 Qi Gong classes, as well as at least 15 MOVE Group classes (*see* Tr. 911-72, 1291-1370, 1687-1747, 1873-2194, 2457-61). Plaintiff was generally noted as participating fully in these group classes and "interact[ing] well with other class members" (*see, e.g.*, Tr. 1692, 2030, 2070, 2458).

In short, there were substantial inconsistencies between Dr. Kulkarni's opinion and the balance of the record evidence and substantial evidence supports the ALJ's finding that Dr. Kulkarni's opinion was not persuasive.

## V.     CONCLUSION

Because the ALJ's decision is supported by substantial evidence and legally sound, it is AFFIRMED.  Judgment shall be entered in accordance with Fed. R. Civ. P. 58, consistent with the U.S. Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292, 296-304 (1993).

DATED this 11th day of March, 2020.

_____
DUSTIN B. PEAD
United States Magistrate Judge